**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON**

**CIVIL ACTION NO. 06-28-DLB**

**NATIONAL INFORMATION AND**                                                 **PLAINTIFF**
**COMMUNICATIONS EQUIPMENT**
**NETWORK INC., d/b/a**
**NICE NETWORK, INC.**

**vs.**                                      **OPINION & ORDER**

**PAUL A. WILLIGAN, ET AL.**                                          **DEFENDANTS**

*******************************

## I. INTRODUCTION

This matter is presently before the Court upon Plaintiff's Motion for Preliminary Injunction (Doc. #11). Defendants filed a Memorandum in Opposition (Doc. #15) and Plaintiff filed a Reply (Doc. #18). An evidentiary hearing was held on the motion on July 20, 2006 (Doc. #42). Parties subsequently filed Findings of Fact and Conclusions of Law (Docs. #45, 46). Therefore, the motion is ripe for the Court's review.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, National Information and Communications Equipment Network, Inc., was incorporated in the state of Indiana in 1989 and does business as NICE Network, Inc. ("NICE"). NICE provides consulting services to the insurance and transit industries, assisting in the evaluation of high value equipment loss claims. Andrew Fahey ("Fahey") is the founder of NICE and has at all times served as the company's President, controlling 98% of NICE's stock (the remaining two percent is held by Fahey's parents). Since 2002,

NICE has maintained is principal place of business in Crescent Springs, Kentucky.

In 1991, NICE hired Defendant Paul Willigan ("Willigan") as a claims consultant. Willigan served as the Vice President of NICE from 1998 until his resignation on January 23, 2006.[1] In January of 2002, Willigan relocated to Connecticut when his wife accepted a job offer in Hartford. Consequently, NICE established a virtual private network connection (VPN) for Willigan to facilitate his continued employment with NICE. The VPN allowed Willigan the ability to work from his home in Connecticut by permitting access to NICE's files and software systems via the company's network server housed in Kentucky.

At no point during Willigan's employment with NICE was he under an employment contract; he was an at-will employee, and later officer. Accordingly, there was never a covenant-not-to-compete made by Willigan and he was never subject to a non-competition agreement. This fact is not disputed by the parties.

Near the end of August 2005, Willigan and his brother, Michael Willigan, established Hitech Claims Consulting ("Hitech") and registered the company as a limited liability company in Connecticut. Paul and Michael Willigan were the sole members of Hitech with the breakdown of ownership being 60% to 40%, respectively.[2] Hitech is in the same business as, and is a direct competitor of, NICE.

Over the five months that followed Hitech's formation, prior to Willigan's resignation

---

[1] In accordance with Defendants' stipulation at the evidentiary hearing (Doc. #42, pp. 46-47), the Court finds that, for purposes of the preliminary injunction, Willigan served as Vice President both *de jure* and *de facto* with the attendant duties as an officer of the corporation.

[2] Paul Willigan indicated at the evidentiary hearing that Michael Willigan had quit the day before and was no longer a member of Hitech (Doc. #42, p. 24). Therefore, as things currently stand, Paul Willigan is the sole member of Hitech.

in January of 2006, Willigan began to take the necessary steps that would eventually lead to the formal operation of Hitech as a competitor of NICE. These steps included the training of his brother in the claims consulting industry, which consisted of working on claims contracted to NICE, as opposed to Hitech, without prior authorization from Fahey. Willigan admits that his brother worked on approximately one quarter of the NICE files originally assigned to Willigan and did so without informing Fahey. This work necessarily involved access to all of NICE's systems and confidential customer files.

In January of 2006, Willigan began doing business as a claims consultant through Hitech. The record at this stage evidences only one conversion by Willigan of a client from NICE to Hitech. The new claim, from Shelley Ripley of Six and Geving Insurance, Inc., was opened on January 20, 2006, three days before Willigan would tender his resignation as Vice President of NICE to Fahey. The claim generated approximately $400 in revenue for Willigan and Hitech. Defendants do not dispute this fact.

The present action was commenced on February 8, 2006. Plaintiff alleges claims for civil conspiracy, breach of fiduciary duty, conversion, misappropriation of trade secrets, copyright violations, and tortious interference with business relationships. However, for purposes of the preliminary injunction, Plaintiff has confined their analysis to the breach of fiduciary duty and misappropriation of trade secrets claims.[3]

### III.   STANDARD OF REVIEW

"A preliminary injunction is 'an extraordinary and drastic remedy' which should be

---

[3] Both parties have addressed various choice of law issues surrounding the state law that is to be applied to the individual claims of Plaintiff. However, the Court's determination of the preliminary injunction does not require entrance into an analysis concerning the applicable state law because issues other than success on the merits prove dispositive of the motion.

granted with great caution." *International Sec. Mgmt. Group, Inc. v. Sawyer*, No. 3:06cv0456, 2006 WL 1638537, at *7 (M.D. Tenn. June 6, 2006) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). Preliminary injunctive relief is intended to "preserve the status quo until the merits of a case may be resolved." *ACLU v. Mercer County*, 219 F. Supp. 2d 777, 781 (E.D. Ky. 2002).

The factors to be considered in determining whether to issue a preliminary injunction include: "(1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction." *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004) (quoting *Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994)). The individual factors are not prerequisites that must be met, but rather they are considerations to be balanced by the Court in its equitable capacity to grant the preliminary injunction. *See id*. Although Federal Rule of Civil Procedure 52 requires the Court to make specific findings concerning each of the four factors, such comprehensive findings upon all factors is not necessary when "fewer are dispositive of the issue." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir. 1985).

### IV.   ANALYSIS

#### A.   Status Quo

The primary purpose of a preliminary injunction is simply "to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). In other words, preliminary injunctive relief is only warranted to

maintain the status quo and prevent irreparable harm so as to secure the Court's ability to render a meaningful decision on the merits. *See ACLU*, 219 F. Supp. 2d at 781.

In this case, a preliminary injunction preventing Defendants from competing with Plaintiff, although limited to specific clients, would act not to preserve the status quo, but instead would have the effect of upsetting the status quo. Willigan is no longer employed with NICE, and in the absence of a non-compete agreement, he is free to do business with and even solicit clients previously associated with NICE. This fact is not in dispute. Any damages that may result from the allegations of wrongful conduct against Defendants would stem from Willigan's actions during his employment period with NICE, not from Defendants' ongoing conduct.

Accordingly, the relief requested by Plaintiff is improper inasmuch as it goes beyond the scope of a preliminary injunction where the conduct sought to be enjoined is not in and of itself actionable. The Court will not disturb the status quo in this matter for the purpose of preventing conduct that is undisputably lawful.

**B.    Irreparable Harm**

"As a general rule, a plaintiff has not established irreparable harm where damages would adequately compensate it for the asserted harm." *Sawyer*, 2006 WL 1638537, at *8 (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)). This second factor of the preliminary injunction standard pertaining to irreparability of harm–which Plaintiff concedes is typically regarded as the most important–weighs heavily against Plaintiff's motion. Assuming *arguendo* that a preliminary injunction is proper in this case as a threshold matter, any potential harm to Plaintiff as a result of Defendants' continued competition with NICE would be sufficiently compensable with money damages at trial.

However unintended, Plaintiff is effectively arguing to transplant the rights and remedies traditionally reserved for breaches of non-compete agreements. A breach of a fiduciary duty can take many forms. Simply because a breach is in the form of wrongful competition does not mean the claim merges into a non-compete framework. The conduct sought to be enjoined is not independently actionable because Willigan is at this stage competing lawfully with NICE based on the lack of any non-compete agreement. Any potential damages at trial will result only from harm associated with Willigan's alleged wrongful acts while employed at NICE, including, *inter alia*, a breach of his fiduciary duty as a corporate officer. Willigan's actions post-resignation are not directly implicated by the underlying claims. *See Sawyer*, 2006 WL 1638537, at *11 ("While [plaintiff] has demonstrated a substantial likelihood of success on the merits of its breach of loyalty claim, that claim arises from acts committed by [defendant] while he was still employed by [plaintiff], which is no longer the case. While the damages already caused by such breach of loyalty may be difficult to calculate, entry of an injunction at this juncture would not have the effect of preventing future damages, nor would it make proof of damages any easier. This factor therefore does not weigh in favor of entry of an injunction.").

Nevertheless, while damages pertaining primarily to lost profits could potentially extend beyond the employment relationship, any harm that may be ongoing could be adequately compensated with money damages.[4] In its motion, Plaintiff does allege ongoing damages from sources other than lost profits, including loss of goodwill and loss of

---

[4] For purposes of the preliminary injunction motion, it is not necessary for the Court to enter into an extended analysis of what damages may be recoverable on the merits. Presumably, however, money damages would be sufficient to compensate Plaintiff for any lost profits stemming from the allegations, even if lost profits prove recoverable beyond the employment relationship.

customers, which Plaintiff claims are irreparable. It has generally been held that such losses are examples of harm that may be considered irreparable because of difficulty in quantification. *See, e.g.*, *Mich. Bell. Tel. Co. v. Engler*, 257 F.3d 587, 599 (6th Cir. 2001); *Sawyer*, 2006 WL 1638537, at *8; *Basicomputer*, 973 F.3d at 511. However, whether Plaintiff chooses to characterize the allegedly irreparable harms as loss of customers, goodwill, or competitive advantage,[5] the reality is that the true irreparable damage has already been done.

Any loss of goodwill from the actions of Willigan would have occurred at the time Hitech entered the marketplace or the first few months thereafter. Additionally, Plaintiff's motion is limited to specific clients that Willigan allegedly took with him after leaving NICE, so further loss of customers or competitive advantage is largely outside the scope of the motion. Furthermore, because Willigan now possesses the lawful right to compete with NICE, any irreparable harm that is ongoing is not actionable and is the natural result of a competitive marketplace. Therefore, any potentially irreparable harm that may have come about as a consequence of the alleged wrongful conduct by Willigan has already transpired or is continuing lawfully.

Because a court need not make specific findings regarding each of the preliminary injunction factors where such findings are not necessary to the disposition of the motion, the Court finds the second factor dispositive of this matter. *See Six Clinics Holding Corp.,*

---

[5] Lost customers are for all intents and purposes the same thing as lost profits. More customers generally equate to more profits. Although Plaintiff's motion only mentions lost customers and loss of goodwill (Doc. #11, p.7), Plaintiff's Proposed Findings of Fact and Conclusions of Law (Doc. #45, p. 18) mentions an additional harm, loss of competitive advantage. This is perhaps the more appropriate characterization of Plaintiffs claims for irreparable harm, although still unpersuasive.

*II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399 (6th Cir. 1997). The failure to demonstrate irreparable harm is fatal to Plaintiff's motion for preliminary injunction. *See Hacker v. Fed. Bureau of Prisons*, No. 06-12425-BC, 2006 WL 2559792 (E.D. Mich. Sept. 1, 2006).

## V.   CONCLUSION

Accordingly, the extraordinary remedy of preliminary injunctive relief is not appropriate to prevent Hitech's competition with NICE, albeit limited to certain clients, because an injunction would unjustifiably shift the status quo, the conduct Plaintiff seeks to prevent is not independently actionable, and Plaintiff would not suffer irreparable harm in the absence of an injunction.

For the reasons set forth above, **IT IS HEREBY ORDERED** that:

(1)   Plaintiff's Motion for Preliminary Injunction (Doc. #11) be, and hereby is, **DENIED**.

This 21st day of September, 2006.



Signed By:
<u>David L. Bunning</u>   DB
United States District Judge

G:\DATA\Opinions\06-28 NICE (PI).wpd